# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "**Agreement**") is made and entered into on the 17th day of February, 2000 by and among **MULTI-GLASS INTERNATIONAL CORP.**, a Delaware corporation (the "**Buyer**"), a wholly-owned subsidiary of **MULTI-GLASS INTERNATIONAL INC.**, an Alberta corporation ("**Multi-Glass**"), **REFRACTORY AND INSULATION SUPPLY CORP.**, a New Jersey corporation (the "**Vendor**") and **JEFF CANTWELL**, an individual resident in Pennsylvania ("**Cantwell**").

The Vendor is engaged in the business of the distribution and fabrication of commercial and industrial insulation products (the "**Business**"). Subject to the limitations and exclusions contained in this Agreement and on the terms and conditions hereinafter set forth, the Vendor desires to sell to the Buyer and the Buyer desires to buy from the Vendor, certain specified assets of the Vendor used in the conduct of the Business.

References in this Agreement to "Section A" refer to a section in Appendix A hereto.

**NOW THEREFORE**, intending to be legally bound hereby, the parties hereto agree as follows:

1.  **Purchase and Sale**

1.1  **Agreement to Sell**

The Vendor agrees to grant, sell, convey and deliver to the Buyer, and the Buyer agrees to buy from the Vendor, upon and subject to the terms and conditions of this Agreement, all right, title and interest of the Vendor in and to (a) the name "**RISCO**" and any variations thereof and all goodwill associated therewith, and (b) all of the assets, properties and rights of the Vendor described in Section 1.2 below (which name, assets, properties and rights are herein sometimes called the "**Assets**"), free and clear of all mortgages, liens, pledges, security interests, charges, claims, restrictions and encumbrances of any nature whatsoever. At the Closing, the Vendor shall deliver possession of the Assets to the Buyer.

1.2  **Included Assets**

The Assets shall include the following assets, properties and rights of the Vendor used directly or indirectly in the conduct of, or generated by or constituting, the Business, except as otherwise expressly set forth in Section 1.3 hereof (a) all inventory, machinery, equipment, tools, vehicles, furniture, furnishings, leasehold improvements, goods, and other tangible personal property, as more particularly described on Exhibit A (collectively, the "**Asset Listing**"); (b) all accounts and accounts receivable, pre-paid items, unbilled costs and fees due to the Vendor as of the Effective Date (as defined in Section 2) from those customers listed on Exhibit 1.2(b) (collectively, the "**Purchased Receivables**"); (c) all supplies and inventories and office and other supplies; (d) all rights under any written or oral contract (including without limitation contracts for the rental of equipment), agreement, lease, plan, instrument, registration, license, certificate of occupancy, other permit or approval of any nature, or other document, commitment, arrangement, undertaking, practice or authorization, as listed in Exhibit 1.4(a) attached, except to the extent that the transfer to the Buyer is prohibited by applicable law or the terms of such contract, agreement or document; (e) all patents, trademarks, service marks, designs, trade names or copyrights, whether registered or unregistered, and any applications therefor; (f) all technologies, methods, formulations, data bases, trade secrets, know-how, inventions and other intellectual property used with the Assets or under development; (g) all computer software (including without limitation documentation and related object and source codes); (h) all rights or choses in action arising out of occurrences before or after the Closing, including without limitation all rights under express or implied warranties relating to the Assets; (i) all information, files, records, data, plans, contracts and recorded knowledge, including without limitation customer and supplier lists, related to the foregoing; and (j) the interests in real property listed on Exhibit B hereto, including without limitation land, structures, improvements, fixtures and appurtenances belonging or appertaining to.

- 2 -

**1.3    Excluded Assets**

Notwithstanding the foregoing, the Assets shall not include any of the following: (a) the accounts, accounts receivable and miscellaneous assets as more particularly described on Exhibit 1.3(a) (the "**Excluded Assets**"), (b) the Business as a going concern, (c) the corporate seals, certificates of incorporation, minute books, tax returns or other records having to do with corporate organization of the Vendor; (d) the rights which accrue or will accrue to the Vendor under this Agreement; (e) the rights to the Vendor's claims for any federal, provincial, state, local, or foreign tax refunds; (f) all cash or cash equivalents on hand, in transit or in bank accounts; and (g) any assets not described or included in the definition of the "**Assets**".

**1.4    Assumption of Liabilities**

(a)    At the Closing hereunder and except as otherwise provided in this Section 1.4, the Buyer shall, in accordance with this Section 1.4, assume and agree to pay, discharge or perform, as appropriate, all liabilities and obligations of the Vendor outstanding as of the Effective Date (as defined in Section 2 below) in respect of the agreements, contracts, commitments and leases as more particularly described in Exhibit 1.4(a) (the "**Assumed Liabilities**"); provided, however, that the Buyer shall not assume or agree to pay, discharge or perform any liabilities or obligations arising out of any breach by the Vendor of any provision of any agreement, contract, commitment or lease referred to in this Section 1.4, including but not limited to liabilities or obligations arising out the Vendor's failure to perform any agreement, contract, commitment or lease in accordance with its terms prior the Closing.

(b)    In no event shall the Buyer assume or incur any liability or obligation under Section 1.4(a) hereof or otherwise in respect of any claim, regardless of when made or asserted, which arises out of or is based upon negligence, strict liability or any express or implied representation, warranty, agreement or guarantee made by the Vendor, or alleged to have been made by the Vendor, or which is imposed or asserted to be imposed by operation of law, in connection with any product designed, manufactured, leased, sold, shipped or installed by or on behalf of the Vendor or for any service performed by or on behalf of the Vendor, including without limitation, any claim relating to the repair or replacement of any such product and any claim seeking recovery for property damage, consequential damage, lost revenue or income or personal injury. In addition to the foregoing, in no event shall the Buyer assume or incur any liability or obligation under Section 1.4(a) hereof or otherwise (i) in respect of any federal, provincial, state, local or foreign income or other tax payable with respect to the sales, assets or income of the Vendor for any period through the Closing Date, (ii) based upon the Vendor's employment of persons at any time prior to or after the Closing Date, (iii) incident to or arising as a consequence of the negotiation or consummation by the Vendor of this Agreement and the transactions contemplated hereby.

(c)    Except for the Assumed Liabilities as specifically provided in Section 1.4(a) hereof, the Buyer shall not assume or be responsible for any liabilities or obligations of or related to the Business or the Vendor.

**1.5    Purchase Price; Earn Out Amount**

The purchase price for the Assets and the covenant not to compete contained in Section 10 hereof shall, subject to the adjustment provisions provided in Section 3.4, be an aggregate of one million, sixty two thousand, one hundred and fifteen dollars ($1,062,115.00) (the "**Purchase Price**"), payable pursuant to Section 2.2 below and Exhibit 2.2 attached, respecting the sum of:

- 3 -

    (i)    four hundred forty one thousand, two hundred and ninety seven dollars ($441,297.00) for all of the Vendor's inventory, less a reserve of forty thousand dollars ($40,000.00);

    (ii)    three hundred thirty two thousand, two hundred and sixty six dollars ($332,266.00) for the Purchased Receivables;

    (iii)    twenty eight thousand, five hundred and fifty two dollars ($28,552.00) for the Vendor's fixed and other tangible assets;

    (iv)    two hundred thousand dollars ($200,000.00) for the assets described in Section 1.1(a);

    (v)    one hundred thousand dollars ($100,000.00) calculated and payable pursuant Exhibit 2.2 attached (the "**Earn Out Amount**"); and

    (vi)    the assumption of the Assumed Liabilities by the Buyer in accordance with Section 1.4(a).

**2.**    **Closing and Effective Date; Access to Records**

    (a)    The closing (the "**Closing**") of the sale and purchase of the Assets shall take place at the offices of the Vendor's legal counsel, Pepper Hamilton LLP, 1235 Westlakes Drive, Suite 400, Berwyn, Pennsylvania, 19312, commencing at 10:00 a.m., local time, on the third business day after notice from the Buyer to the Vendor of satisfaction or waiver of the conditions precedent pursuant to Section 6 hereof, or such other date as mutually agreed to by the Buyer and the Vendor, which is presently contemplated to be February 17, 2000. The date on which the Closing takes place is sometimes referred to herein as the "**Closing Date**". The Purchase Price for the Assets shall be calculated and effective as of February 16, 2000 (the "**Effective Date**"), notwithstanding that the Closing Date is subsequent to the Effective Date, subject to the adjustment procedures in Section 3.4.

    (b)    For the purposes of allowing the Buyer to review the Business so as to enable the Buyer to determine if there are any facts relating to the Assets or the Business, which if known to the Buyer, would cause the Buyer to elect not to proceed with the acquisition of the Assets, the Vendor hereby permits the Buyer to conduct, up to and including the Closing Date, such investigations of the Assets, the Vendor's financial condition, contractual obligations, business affairs and corporate affairs (all as they relate solely to the Assets), as the Buyer may deem reasonably necessary or advisable in order to ensure that each of the representations, warranties, covenants and agreements as are required by the Buyer to ensure the validity and existence of the Assets are true and correct on the Closing Date.

**2.1**    **Items to be Delivered by the Vendor**

At the Closing and subject to the terms and conditions herein contained, the Vendor shall take all such steps as may be required to put the Buyer in actual possession and operating control of the Assets as of the Effective Date including, without limitation, delivery of the following to the Buyer:

    (a)    such documents of conveyance with covenants of warranty, assignments, endorsements, and other good and sufficient instruments and documents of conveyance and transfer, in form

- 4 -

reasonably satisfactory to the Buyer and its counsel, as may be requested by the Buyer to evidence the transfer and assignment to, and vesting in, the Buyer of all right, title and interest in and to the Assets of the Vendor, including without limitation, (i) good, valid and enforceable title in and to all of the Assets owned by the Vendor, (ii) good, valid and enforceable leasehold interests in and to all of the Assets leased by the Vendor as lessee, and (iii) all of the Vendor's rights under all agreements, contracts, commitments, leases, plans, bids, quotations, proposals, instruments and other documents included in the Assets to which the Vendor is a party or by which it has rights on the Effective Date; and

(b) all of the agreements, contracts, commitments, leases, plans, bids, quotations, proposals, instruments, computer programs and software, data bases whether in the form of computer tapes or otherwise, related object and source codes, manuals and guidebooks, price books and price lists, customer and subscriber lists, supplier lists, sales records, files, correspondences, rulings issued by governmental entities, and other documents, books, records, papers, files, office supplies and data belonging to the Vendor which are part of the Assets.

**2.2 Payment of Purchase Price; Items to be Delivered by the Buyer**

At the Closing and subject to the terms and conditions herein contained, the Buyer shall deliver (i) immediately available funds in the amount of the Purchase Price by wire transfer to the Vendor, subject to the provisions of Section 3.4 and Exhibit 2.2 hereof; and (ii) an undertaking whereby the Buyer will assume and agree to pay, discharge or perform, as appropriate, the Assumed Liabilities to the extent and as provided in Section 1.4 hereof in form reasonably satisfactory to the Vendor and its counsel.

**2.3 Other Closing Documents**

At the Closing, the Vendor shall also deliver to the Buyer, and the Buyer shall also deliver to the Vendor, the agreements, certificates, opinions and other instruments and documents referred to in Sections 6 and 7 hereof, respectively.

**2.4 Third Party Consents**

To the extent that the Vendor's rights under any agreement, contract, commitment, lease or other Asset to be assigned to the Buyer under Section 1.2(d) hereof may not (whether pursuant to its terms or under applicable law) be assigned without the consent of another person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and the Vendor, at its sole expense, shall use its best efforts to obtain any such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair the Buyer's rights under the Asset in question so that the Buyer would not in effect acquire the benefit of all such rights, the Vendor, to the maximum extent permitted by law and the Asset, shall act after the Closing as the Buyer's agent in order to obtain for the Buyer the benefits thereunder and shall cooperate, to the maximum extent permitted by law and the Asset, with the Buyer in any other reasonable arrangement designed to provide such benefits to the Buyer.

**3. Post-Closing Matters**

**3.1 Employees**

- 5 -

After the Closing, the Buyer shall be under no obligation to offer employment to any of the Vendor's employees, and the Buyer shall extend offers of employment, upon terms acceptable to the Buyer, only to those individuals (if any) selected by the Buyer in its discretion. Prior to the Closing, the Buyer shall provide to the Vendor a list of those employees of the Business to whom the Buyer intends to offer employment. As to employees of the Business to whom the Buyer does not offer employment, the Vendor agrees that it shall either retain such employees or terminate them prior to the Closing. The Vendor agrees to enter into severance agreements, in form and substance satisfactory to the Buyer, with any employees terminated pursuant to this Section 3.1. It is expressly understood and agreed that the continuance of employment by the Buyer following Closing shall not constitute any contract, commitment or understanding (expressed or implied) on the part of the Buyer to establish or to continue any employment relationship with any person for any fixed term or duration or on any specific terms or conditions (including without limitation salary and benefits) other than those which the Buyer, in its sole discretion, may establish, and any such employment by any of such individuals with the Buyer after the Closing shall be "at will" and may be terminated by the Buyer at any time. The Vendor agrees to discharge all liabilities and obligations of the Vendor to its employees, including, without limitation, all claims for earned or accrued vacation, sick leave or medical benefits.

3.2  **Access to Records**

After the Closing, the Buyer shall make all agreements, documents, information and other items referred to in Section 2.1(b) hereof available to the Vendor for inspection, upon reasonable prior notice to the Buyer, during normal business hours, at no expense to the Buyer and only for a proper purpose, including without limitation the use thereof in connection with (a) the indemnification and other obligations of the Vendor hereunder, or (b) the payment of any liability to any third party which is owed by the Vendor.

3.3  **Further Assurances**

The Vendor at its expense from time to time after the Closing, at the Buyer's request, will execute, acknowledge and deliver to the Buyer such other instruments of conveyance and transfer and will take such other actions and execute and deliver such other documents, certifications and further assurances as the Buyer may reasonably require in order to vest more effectively in the Buyer, or to put the Buyer more fully in possession of, any of the Assets, or to better enable the Buyer to complete, perform or discharge any of the liabilities or obligations to be assumed by the Buyer at the Closing pursuant to Section 1.4 hereof. Each of the parties hereto will cooperate with the other and execute and deliver to the other parties hereto such other instruments and documents and take such other actions as may be reasonably requested from time to time by any other party hereto as necessary to carry out, evidence and confirm the intended purposes of this Agreement.

3.4  **Post-Closing Adjustment to Purchase Price; Holdback, Earn Out Amount**

    (a)    The Purchase Price is based on the Asset Listing attached as Exhibit A and the Purchased Receivables described on Exhibit 1.2(b). The Purchase Price may be adjusted as a result of changes to the Asset Listing and the Purchased Receivables that have occurred between the Effective Date and the Closing Date of greater than $5,000.00. Any adjustments to the Purchase Price shall be payable by cash or assumption of additional liabilities by the Buyer, as the case may be.

    (b)    As soon as reasonably practical following (but not more than 30 days after) the Closing Date, the Buyer shall prepare and deliver to the Vendor a listing of the Assets and the Purchased Receivables as of the Closing Date (the "**Closing Asset Listing**") and the Net

- 6 -

Asset Value (as defined in Section 3.4(d) hereof) calculation as of the Closing Date which will, in the case of the Purchased Receivables and the inventory, reflect the results of a physical inventory and review of same to be completed by the Buyer and the Vendor prior to the Closing Date, subject to any actual variances in the Purchased Receivables and the inventory occurring up to and including the Closing Date. Such Closing Asset Listing and Net Asset Value calculation shall be prepared in accordance with generally accepted accounting principles using the same historic practices, methods and criteria employed by the Vendor in connection with its preparation of the Asset Listing and the Purchased Receivables, to the extent such practices, methods and criteria are consistent with generally accepted accounting principles. All expenses incurred in connection with the preparation of the Closing Asset Listing and the Net Asset Value calculation shall be the responsibility of the Buyer.

(c) The Closing Asset Listing and the Net Asset Value calculation shall become final and binding upon the parties unless within 20 days following its submittal to the Vendor, the Vendor notifies the Buyer of its objection thereto. If the Vendor notifies the Buyer of any objection to the Closing Asset Listing and Net Asset Value calculation, the Vendor and the Buyer shall negotiate in good faith to resolve any differences. If within 30 days following the receipt of such notice by the Buyer any of such differences have not been resolved, they shall be resolved by Goldenberg Rosenthal, LLP, certified public accountants, whose opinion thereon and the resulting Closing Asset Listing and Net Asset Value calculation shall be final, binding and not subject to any appeal. The fees and expenses of Goldenberg Rosenthal, LLP shall be paid one-half by the Vendor and one-half by the Buyer.

(d) Within 10 days following the final determination of the Closing Asset Listing and the Net Asset Value, either (i) the Buyer shall pay to the Vendor the amount, if any, by which the Net Asset Value as of the Closing Date exceeds seven hundred fifty eight thousand, seven hundred and eighty two dollars and thirty six cents ($758,782.36), or (ii) the Vendor shall pay to the Buyer the amount, if any, by which the Net Asset Value as of the Closing Date is less than seven hundred fifty eight thousand, seven hundred and eighty two dollars and thirty six cents ($758,782.36), as the case may be. "**Net Asset Value**" shall mean the aggregate net value of the Assets and the Purchased Receivables (which, in the case of inventory, shall be net of the $40,000.00 reserve referred to in Section 1.5(i), minus liabilities assumed by the Buyer that are currently due and payable, as of the Closing Date determined in accordance with generally accepted accounting principles consistently applied. As collateral security for the Vendor's obligations pursuant to this Section 3.4(d), Section 3.4(f) below, and Section 8.1 hereof, the Vendor grants a first priority specific security interest in the Holdback Amount (as defined and described on Exhibit 2.2 hereof). The Vendor acknowledges that the Buyer may realize on the Holdback Amount in the event the Vendor fails to pay any amount due to the Buyer pursuant to Section 3.4(d), Section 3.4(f) or Section 8.

(e) Nothing in this Section 3.4 shall preclude any party from exercising, or shall adversely affect or otherwise limit in any respect the exercise of, any right or remedy available to it hereunder or otherwise for any misrepresentation or breach of warranty hereunder, but neither the Buyer nor the Vendor shall have any right to dispute the Closing Asset Listing or Net Asset Value calculation or any portion thereof once it has been finally determined in accordance with Section 3.4(c) hereof.

- 7 -

(f)  In the event any of the Purchased Receivables remain uncollected one hundred and eighty (180) days following the Effective Date, the Buyer may elect to recover the amount of any uncollected Purchased Receivables from the Holdback Amount (as defined and described on Exhibit 2.2 hereof). The Vendor acknowledges that the Holdback Amount shall be held until the earlier of:

(i)  six (6) months from the date of the Effective Date; or
(ii) collection in full of the Purchased Receivables.

- 8 -

4. **Representations and Warranties of the Vendor and Cantwell**

The Vendor and Cantwell represent and warrant to the Buyer as set forth in Section A.1 of Appendix A hereto, which Section is incorporated in this Section 4 by reference and is deemed to be a part of this Agreement.

5. **Representations and Warranties of the Buyer**

The Buyer represents and warrants to the Vendor and Cantwell as set forth in Section A.2 of Appendix A hereto, which Section is incorporated in this Section 5 by reference and is deemed to be a part of this Agreement.

6. **Conditions Precedent to the Buyer's Obligations**

All obligations of the Buyer under this Agreement are subject to the fulfilment or satisfaction, prior to or at the Closing, of each of the following conditions precedent:

6.1 **Performance by the Vendor**

The Vendor shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

6.2 **Opinion of the Vendor's Counsel**

The Buyer shall have received the written opinion dated the Closing Date of Pepper Hamilton, counsel for the Vendor, in form and substance satisfactory to the Buyer and its counsel.

6.3 **Consents**

The consent to or approval of the transactions contemplated by this Agreement from each person whose consent or approval is required in the opinion of the Buyer shall have been obtained in form and substance satisfactory to the Buyer.

6.4 **No Threatened or Pending Litigation**

On the Closing Date, no suit, action or other proceeding, or injunction or judgment relating thereto, shall be threatened or be pending before any court or governmental or regulatory official, body or authority in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with this Agreement or the consummation of the transactions contemplated hereby, and no investigation that might result in any such suit, action or proceeding shall be pending or threatened.

6.5 **Approval of Due Diligence**

The Buyer shall have received the requisite approval from the board of directors of Multi-Glass of the transactions contemplated by this Agreement and of the due diligence effected by the Buyer regarding the Assets.

6.6 **Regulatory, Contractual Approvals**

The Buyer shall have obtained all applicable governmental, regulatory and contractual approvals to complete the transactions contemplated by this Agreement, including, without limitation, arrangements satisfactory to the Buyer regarding outstanding sales taxes of the Business due to the Commonwealth of Pennsylvania and the State of New Jersey.

### 6.7 Change of Name

Prior to the Closing Date, the Vendor shall provide the Buyer with a consent directed to all applicable government registries to the effect that the Vendor consents to the use of the name "RISCO" and any variations thereof. On the Closing Date, the Vendor shall effect a change of its name to a name acceptable to the Buyer, acting on a commercially reasonable basis.

### 6.8 Approval of Counsel; Corporate Matters

All actions, proceedings, resolutions, instruments and documents required to carry out this Agreement or incidental hereto and all other related legal matters shall have been approved on the Closing Date by Burstall Ward, Alberta counsel for the Buyer and by Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Pennsylvania counsel for the Buyer, in the exercise of their reasonable judgment. The Vendor shall also have delivered to the Buyer such other documents, instruments, certifications and further assurances as such counsel for the Buyer may reasonably require.

### 7. Conditions Precedent to the Vendor's Obligations

All obligations of the Vendor under this Agreement are subject to the fulfilment or satisfaction, prior to or at the Closing, of each of the following conditions precedent:

### 7.1 Performance by the Buyer

The Buyer shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by the Buyer prior to or at the Closing.

### 7.2 Opinion of the Buyer's Counsel

The Vendor shall have received the written opinion dated the Closing Date of Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Pennsylvania counsel for the Buyer, in form and substance satisfactory to the Vendor and its counsel.

### 7.3 No Injunction

There shall be in effect no preliminary or permanent injunction or other order of a court or governmental or regulatory agency of competent jurisdiction directing that the transactions contemplated by this Agreement not be consummated.

### 7.4 Approval of Counsel; Corporate Matters

All actions, proceedings, resolutions, instruments and documents required to carry out this Agreement or incidental hereto and all other related legal matters shall have been approved on the Closing Date by Pepper Hamilton, counsel for the Vendor, in the exercise of its reasonable judgment. The Buyer shall also have

- 10 -

delivered to the Vendor such other documents, instruments, certifications and further assurances as such counsel for the Vendor may reasonably require.

## 8. Indemnification

### 8.1 Indemnification by the Vendor and Cantwell

From and after the Closing, the Vendor and Cantwell shall reimburse, indemnify and hold harmless the Buyer and its affiliates (each such person and its successors and assigns is referred to herein as a "**Buyer Indemnified Party**") against and in respect of:

(a) any and all damages, losses, settlement payments, deficiencies, liabilities, costs and expenses suffered, sustained, incurred or required to be paid by any Buyer Indemnified Party because of or that result from, relate to or arise out of:

(i) the untruth, inaccuracy or breach of, or the failure to fulfil, any representation, warranty, agreement, covenant or statement of the Vendor or Cantwell contained in this Agreement or in any certificate or other writing furnished to the Buyer by or on behalf of the Vendor or Cantwell in connection herewith;

(ii) the assertion against any Buyer Indemnified Party of any liability or obligation relating to or arising out of the business, operations or assets of the Vendor prior to the Effective Date or the actions or omissions of the Vendor's directors, officers, shareholders, employees or agents prior to the Closing Date, including without limitation any liability or obligation relating to, and any claim which arises out of or is based upon, (1) negligence, (2) strict liability, (3) any Environmental Claim (as defined in Section A.1.19 hereof) or which otherwise relates to, or involves a claim, liability or obligation which arises out of or is based upon, any Environmental Law (as defined in Section A. 1.19 hereof) to the extent that such liability or obligation relates to or arises out of, in whole or in part, any activity occurring, condition existing, omission to act or other matter existing prior to the Closing Date, (4) any other statute, rule or regulation or (5) any express or implied representation, warranty, agreement or guarantee made by or on behalf of the Vendor, or alleged to have been made by or on behalf of the Vendor, or any liability or obligation which is imposed or asserted to be imposed on the Vendor or any successor corporation by operation of law, in connection with any product designed, used, rented, sold, manufactured, shipped or installed by or on behalf of the Vendor, or for any service performed by or on behalf of the Vendor, including without limitation any acts, omissions, workmanship or material performed or sold by the Vendor, in any case prior to the Closing Date and irrespective of the date that any claim, suit or other cause of action related to any of the foregoing is filed or otherwise instituted against the Vendor (with all references to the Vendor in this Section 8.1(a)(ii) also deemed to be references to any predecessor in business of the Vendor); and

(b) any and all actions, suits, claims, proceedings, investigations, demands, assessments, audits, fines, judgments, costs and other expenses (including without limitation reasonable legal fees and expenses) incident to any of the foregoing or to the enforcement of this Section 8.1.

- 11 -

**8.2   Indemnification by the Buyer**

From and after the Closing, the Buyer shall reimburse, indemnify and hold harmless the Vendor and Cantwell (each such person, its successors, and assigns is referred to herein as a "**Vendor Indemnified Party**") against and in respect of:

(a)   any and all damages, losses, settlement payments, deficiencies, liabilities, costs and expenses suffered, sustained, incurred or required to be paid by any Vendor Indemnified Party because of or that result from, relate to or arise out of:

(i)   the untruth, inaccuracy or breach of, or the failure to fulfil, any representation, warranty, agreement, covenant or statement of the Buyer contained in this Agreement or in any certificate or other writing furnished to the Vendor by or on behalf of the Buyer in connection herewith; or

(ii)   the operation of the Business after the Closing (except to the extent that any such damages, losses, settlement payments, deficiencies, liabilities, costs and expenses relate to a pre-closing agreement, commitment, action, other circumstance or condition for which a Buyer Indemnified Party would be entitled to indemnification from the Vendor under Section 8.1 hereof, without application of Section 8.3(a) hereof); and

(b)   any and all actions, suits, claims, proceedings, investigations, demands, assessments, audits, fines, judgments, costs and other expenses (including without limitation reasonable legal fees and expenses) incident to any of the foregoing or to the enforcement of this Section 8.2.

**8.3   Limitations on Liability**

(a)   Except as otherwise provided in Section 8.5 hereof and except that this limitation shall not apply to any indemnification claims arising under or with respect to Section 9(a) hereof or to any purchase price adjustments made in accordance with Section 3.4 hereof, the Vendor and Cantwell shall not be liable to any Buyer Indemnified Party under Section 8.1 for any misrepresentation or breach of warranty until the aggregate amount for which they would otherwise (but for this provision) be liable to any or all Buyer Indemnified Parties for all such misrepresentations and breaches of warranty exceeds in the aggregate the sum (the "**Deductible**") of $5,000.00.

(b)   Except as otherwise provided in Section 8.5 hereof and except that this limitation shall not apply to any indemnification claims arising under or with respect to Section 9(b) hereof or to any purchase price adjustments made in accordance with Section 3.4 hereof, the Buyer shall not be liable to any Vendor Indemnified Party under Section 8.2 hereof for any misrepresentation or breach of warranty until the aggregate amount for which it would otherwise (but for this provision) be liable to any or all Vendor Indemnified Parties for all such misrepresentations and breaches of warranty exceeds in the aggregate the Deductible.

(c)   Notwithstanding any other provisions of this Agreement, Cantwell shall not be liable to any Buyer Indemnified Party for any amount payable pursuant to Section 8.1 in excess of the Purchase Price.

**8.4   Survival of Representations and Warranties**

- 12 -

Except as provided in Section 8.5 hereof, the representations and warranties given or made by the Vendor, Cantwell or the Buyer in this Agreement or in any certificate or other writing furnished in connection herewith shall survive the Closing for a period of two years after the Closing Date and shall thereafter terminate and be of no further force or effect, except that (a) all representations and warranties set forth in Section A.1.11 shall survive the Closing for the period of the applicable statutes of limitation plus any extensions or waivers thereof, (b) all representations and warranties set forth in Sections 9(a), A. 1.2, A. 1.10 and A. 1.18 hereof shall survive the Closing without limitation and (c) any representation or warranty as to which a claim (including without limitation a contingent claim) shall have been asserted during the survival period shall continue in effect with respect to such claim until such claim shall have been finally resolved or settled. Notwithstanding any investigation or audit conducted before or after the Closing Date or the decision of any party to complete the Closing, each party shall be entitled to rely upon the representations and warranties of the other party or parties set forth herein.

### 8.5  Exceptions to Limitations

Nothing herein shall be deemed to limit or restrict in any manner any rights or remedies which any Buyer Indemnified Party has, or might have, at law, in equity or otherwise, against the Vendor or Cantwell, or which any Vendor Indemnified Party has or might have against the Buyer, based on any willful misrepresentation, willful breach of warranty or willful failure to fulfil any agreement or covenant.

### 8.6  Payment of Indemnification Obligations

In the event that the Vendor, Cantwell or the Buyer is required to make any payment under this Section 8, such party shall promptly pay the Buyer Indemnified Party or the Vendor Indemnified Party, as the case may be, the amount of such indemnity obligation. If there should be a dispute as to such amount, such Vendor or the Buyer, as the case may be, shall nevertheless pay when due such portion, if any, of the obligation as shall not be subject to dispute. The difference, if any, between the amount of the obligation ultimately determined as properly payable under this Section 8 and the portion, if any, theretofore paid shall bear interest for the period from the date the amount was demanded by the Buyer Indemnified Party or the Vendor Indemnified Party, as the case may be, until payment in full, payable on demand, at the fluctuating rate per annum which at all times shall be two percentage points in excess of the rate which is publicly announced from time to time by Royal Bank of Canada as its "prime rate".

### 8.7  Indemnification Procedure

All claims for indemnification under Sections 8.1 and 8.2 hereof shall be asserted and resolved as follows:

(a)  In the event that any claim or demand for which a party (the "**Indemnifying Party**") would be liable to any Buyer Indemnified Party or Vendor Indemnified Party (in either case, the "**Indemnified Party**") hereunder is asserted against an Indemnified Party by a third party, the Indemnified Party shall with reasonable promptness notify the Indemnifying Party of such claim or demand, specifying the nature of such claim or demand and the amount or the estimated amount thereof to the extent then feasible (which estimate shall not be conclusive of the final amount of such claim or demand) (the "**Claim Notice**"). The Indemnifying Party shall have 10 days from the receipt of the Claim Notice (the "**Notice Period**") to notify the Indemnified Party (i) whether or not the Indemnifying Party disputes the Indemnifying Party's liability to the Indemnified Party hereunder with respect to such claim or demand and (ii) if the Indemnifying Party does not dispute such liability, whether or not the Indemnifying Party desires, at the sole cost and expense of the Indemnifying Party, to

- 13 -

defend against such claim or demand, provided that the Indemnified Party is hereby authorized (but not obligated) prior to and during the Notice Period to file any motion, answer or other pleading which the Indemnified Party shall deem necessary or appropriate to protect the Indemnified Party's interests. In the event that the Indemnifying Party notifies the Indemnified Party within the Notice Period that the Indemnifying Party does not dispute the Indemnifying Party's obligation to indemnify hereunder and desires to defend the Indemnified Party against such claim or demand and except as hereinafter provided, the Indemnifying Party shall have the right to defend by appropriate proceedings, which proceedings shall be promptly settled or prosecuted by the Indemnifying Party to a final conclusion. If the Indemnified Party desires to participate in, but not control, any such defense or settlement the Indemnified Party may do so at the Indemnified Party's sole cost and expense. If the Indemnifying Party elects not to defend the Indemnified Party against such claim or demand, whether by not giving the Indemnified Party timely notice as provided above or otherwise, then the Indemnified Party, without waiving any rights against the Indemnifying Party, may settle or defend against any such claim in the Indemnified Party's sole discretion and, if it is ultimately determined that the Indemnifying Party is responsible therefor under this Section 8, then the Indemnified Party shall be entitled to recover from the Indemnifying Party the amount of any settlement or judgment and all indemnifiable costs and expenses of the Indemnified Party with respect thereto, including without limitation interest as provided in Section 8.6 hereof.

(b) If the amount of the claim or demand exceeds the remaining unpaid aggregate maximum indemnification obligation of the Vendor as set forth in Section 8.3, then the Buyer Indemnified Party shall have the right to control the defense of any such claim or demand and the amount of any judgment or settlement and the reasonable costs and expenses of defense shall be included as part of the indemnification obligations of the Indemnifying Party hereunder. If the Buyer Indemnified Party should elect to exercise such right, the Indemnifying Party shall have the right to participate in, but not control, the defense of such claim or demand at the sole cost and expense of the Indemnifying Party.

(c) In the event the Indemnified Party should have a claim against the Indemnifying Party hereunder which does not involve a claim or demand being asserted against or sought to be collected by a third party, the Indemnified Party shall with reasonable promptness send a Claim Notice with respect to such claim to the Indemnifying Party.

(d) Nothing herein shall be deemed to prevent the Indemnified Party from making a claim hereunder for potential or contingent claims or demands provided the Claim Notice sets forth the specific basis for any such potential or contingent claim or demand to the extent then feasible and the Indemnified Party has reasonable grounds to believe that such a claim or demand may be made.

(e) The Indemnified Party's failure to give reasonably prompt notice to the Indemnifying Party of any actual, threatened or possible claim or demand which may give rise to a right of indemnification hereunder shall not relieve the Indemnifying Party of any liability which the Indemnifying Party may have to the Indemnified Party except to the extent that the failure to give such notice prejudiced the Indemnifying Party.

9. **No Brokers' or Finders' Fees**

- 14 -

(a) The Vendor and Cantwell represent and warrant that all discussions, activities and negotiations relative to this Agreement have been carried on by it directly without the intervention of any person who may be entitled to any brokerage or finder's fee or other commission in respect hereof or the consummation of the transactions contemplated hereby, and the Vendor and Cantwell agree to indemnify and hold harmless the Buyer Indemnified Parties against any and all claims, losses, liabilities and expenses (including without limitation reasonable legal fees and expenses) which may be asserted against or incurred or paid by any of them as a result of the Vendor's or Cantwell's dealings, arrangements or agreements with any such person.

(b) The Buyer represents and warrants that all discussions, activities and negotiations relative to this Agreement have been carried on by the Buyer directly without the intervention of any person who may be entitled to any brokerage or finder's fee or other commission in respect hereof or the consummation of the transactions contemplated hereby, and the Buyer agrees to indemnify and hold harmless the Vendor Indemnified Parties against any and all claims, losses, liabilities and expenses (including without limitation reasonable legal fees and expenses) which may be asserted against or incurred or paid by any of them as a result of the Buyer's dealings, arrangements or agreements with any such person.

10. **Covenant Not to Compete**

(a) From the Effective Date until the third anniversary of the Closing, each of the Vendor and Cantwell agrees that each will not, anywhere in Philadelphia metropolitan area, unless acting for the Buyer or its affiliates or in accordance with the Buyer's prior written consent, (i) (directly or indirectly) own, manage, operate, join, control, finance or participate in the ownership, management, operation, control or financing of, or be connected as an officer, director, employee, principal, agent, representative, consultant, investor, owner, partner, manager, joint venturer or otherwise with, or permit its or his name to be used by or in connection with, any business or enterprise engaged anywhere in Philadelphia metropolitan area in any of the businesses engaged in by the Business on the date of this Agreement, (ii) call on or solicit any person who or which during such non-compete period is, or within 18 months prior to any such solicitation had been, a customer of the Business or the Buyer with respect to such businesses covered by clause (i) above or (iii) solicit the employment of any person who during such non-compete period is, or 18 months prior to any such solicitation had been, employed by the Business or the Buyer on a full or part-time basis.

(b) The foregoing restriction shall not be construed to prohibit the ownership by the Vendor or Cantwell of not more than five percent of any class of securities of any corporation which is engaged in any of the foregoing businesses having a class of securities registered pursuant to any applicable securities legislation or (ii) whose securities are publicly traded on a recognized securities exchange, provided that such ownership represents a passive investment and that the Vendor, Cantwell, nor any group of persons including the Vendor or Cantwell in any way, either directly or indirectly, manages or exercises control of any such corporation, guarantees any of its financial obligations, otherwise takes any part in its business, other than exercising its rights as a shareholder, or seeks to do any of the foregoing.

(c) The Vendor and Cantwell acknowledge that (i) the provisions of this Section 10 are reasonable and necessary to protect the legitimate interests of the Buyer and its affiliates, (ii) any violation of this Section 10 will result in irreparable injury to the Buyer and its

- 15 -

      affiliates and that damages at law would not be reasonable or adequate compensation to the Buyer and its affiliates for a violation of this Section 10 and (iii) the Buyer and its affiliates shall be entitled to have the provisions of this Section 10 specifically enforced by preliminary and permanent injunctive relief without the necessity of proving actual damages and without posting bond or other security as well as to an equitable accounting of all earnings, profits and other benefits arising out of any violation of this Section 10, including without limitation estimated future earnings. In the event that the provisions of this Section 10 should ever be deemed to exceed the time, geographic, product or any other limitations permitted by applicable law, then such provisions shall be deemed reformed to the maximum permitted by applicable law.

    (d)    The Buyer, Cantwell and the Vendor intend to and do hereby confer jurisdiction to enforce the covenants set forth in this Section 10 upon the courts of any jurisdiction within the geographical scope of such covenants. In addition to Section 11.7 hereof and not in limitation thereof, if the courts of any one or more of such jurisdictions hold such covenants unenforceable in whole or in part, it is the intention of the Buyer and the Vendor that such determination not bar or in any way adversely affect the right of the Buyer and its affiliates to equitable relief and remedies hereunder in courts of any other jurisdiction as to breaches or violations of this Section 10, such covenants being, for this purpose, severable into diverse and independent covenants.

## 11. Miscellaneous

### 11.1 Expenses

The parties hereto shall pay their own expenses incidental to the preparation of this Agreement, the carrying out of the provisions of this Agreement and the consummation of the transactions contemplated hereby.

### 11.2 Contents of Agreement; Parties in Interest; Etc.

This Agreement sets forth the entire understanding of the parties hereto with respect to the transactions contemplated hereby and shall not be amended or modified except by a written instrument duly executed by each of the parties hereto. Any and all previous agreements and understandings between or among the parties regarding the subject matter hereof, whether written or oral are superseded by this Agreement.

### 11.3 Assignment and Binding Effect

All of the terms and provisions of this Agreement shall be binding upon and enure to the benefit of and be enforceable by the successors and assigns of the parties hereto.

### 11.4 Waiver

Any term or provision of this Agreement may be waived at any time by the party entitled to the benefit thereof by a written instrument duly executed by such party.

### 11.5 Notices

Any notice, request, claim, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given if delivered personally or sent by telecopier, telegram, by registered or certified mail, postage prepaid, or by recognized courier service, as follows:

- 16 -

If to the Buyer, to:

>Multi-Glass International Corp.
>c/o Multi-Glass International Inc.
>191 Attwell Drive, Unit 1
>Etobicoke, Ontario   M9W 5Z2
>Attention:  Mr. William G. Edwards
>Telecopier No.: (416) 798-3974

With a required copy to:

>Burstall Ward
>Barristers & Solicitors
>Suite 3100, Home Oil Tower
>324 - 8th Avenue S.W.
>Calgary, Alberta   T2P 2Z2
>Attention: Mr. Scott W. Sangster
>Telecopier No.: (403) 233-2131

If to the Vendor and Cantwell:

>Refractory and Insulation Supply Corp.
>c/o 97 Wood Street, 2nd Floor
>Bristol, Pennsylvania
>U.S.A.   19007
>Attention:  Mr. Jeff Cantwell
>Telecopier No.: (215) 788-1323

With a required copy to:

>Pepper Hamilton LLP
>1235 Westlakes Drive, Suite 400
>Berwyn, Pennsylvania
>U.S.A.   19312
>Attention: Cuyler Walker
>Telecopier No.: (610) 640-7835

or to such other address as the person to whom notice is to be given may have specified in a notice duly given to the sender as provided herein. Such notice, request, claim, demand, waiver, consent, approval or other communication shall be deemed to have been given as of the date so delivered, telegraphed, mailed or dispatched and, if given by any other means, shall be deemed given only when actually received by the addressees.

**11.6   Sales, Transfer, Documentary and Ad Valorem Taxes etc.**

The Buyer shall pay all sales, transfer and documentary taxes, if any, due as a result of the transfer of the Assets to the Buyer. All ad valorem and similar taxes relating to the Assets which are assessed on the basis of a time period which includes a period prior to the Closing and a period following the Closing shall be paid by the Vendor.

**11.7   Pennsylvania Law to Govern; Consent to Jurisdiction**

- 17 -

This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the Commonwealth of Pennsylvania. Each of the Buyer and Vendor irrevocably and unconditionally (a) agree that any suit, action or other legal proceeding (collectively, the "Suit") instituted by the Vendor and arising out of this Agreement shall be brought and adjudicated only in the Commonwealth of Pennsylvania, (b) agrees that any Suit instituted by the Buyer arising out of this Agreement shall be brought and adjudicated only in the Commonwealth of Pennsylvania, and (c) waive and agree not to assert by way of motion, as a defense or otherwise in any such Suit, any claim that it is not subject to the jurisdiction of the above courts, that such Suit is brought in a inconvenient forum or that the venue of such Suit is improper. The Buyer and the Vendor also irrevocably and unconditionally consent to the service of any process, pleadings, notices or other papers in a manner permitted by the notice provisions of Section 11.5 hereof.

**11.8   Possession and Risk**

The Assets shall be in the possession and remain at the risk of the Vendor until the Effective Date. At such time, and upon payment by the Buyer of all required monies hereunder on the Closing Date, and delivery of all required closing documents, title to the Assets will pass to the Buyer. Thereafter, the Assets shall be at the sole risk of the Buyer and the Vendor shall have no responsibility of any nature or kind therefore.

**11.9   No Benefit to Others**

The representations, warranties, covenants and agreements contained in this Agreement are for the sole benefit of the parties hereto and, in the case of Section 8 hereof, the other Buyer Indemnified Parties and Vendor Indemnified Parties, and their successors and assigns, and they shall not be construed as conferring any rights on any other persons.

**11.10  Headings; Gender; "Person"; "Dollars"; "$"**

All section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation hereof. Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires. Any reference to a "person" herein shall include an individual, firm, corporation, body corporate, partnership, trust, joint venture, governmental authority or body, association, unincorporated organization or any other entity. Any reference to "dollars" or "$" shall refer to U.S. dollars.

**11.11  Exhibits; Appendix; Schedules**

The Exhibits hereto, Appendix A hereto and the Schedules referred to herein and therein are intended to be and hereby are specifically made a part of this Agreement.

**11.12  Severability**

If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable in any jurisdiction, the remainder hereof, and the application of such provision to such person or circumstance in any other jurisdiction or to other persons or circumstances in any jurisdiction, shall not be affected thereby, and to this end the provisions of this Agreement shall be severable.

**11.13  Counterparts; Telecopier Execution**

This Agreement may be executed in any number of counterparts and any party hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which

- 18 -

counterparts taken together shall constitute but one and the same instrument. This Agreement shall become binding when one or more counterparts taken together shall have been executed and delivered by the parties.

GV: #140733 v1 30L901!.WPD

- 19 -

It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts. Execution and delivery of counterparts of this Agreement by telecopier by any party shall be binding on all parties to this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement on the date first written.

MULTI-GLASS INTERNATIONAL CORP.

Per: _____
Name: William G. Edwards
Title: Vice-President, Finance          (c/s)

REFRACTORY AND INSULATION SUPPLY CORP.

Per: _____
Name: Daniel T. Sonnelitter
Title: President                         (c/s)

_____        _____
David W. McD...                        JEFF CANTWELL
WITNESS

::ODMA\PCDOCS\GV\140733\1

GV: #140733 v1 30L901!.WPD